### JOHN M. WALKER,

*vs.*

### JONATHAN B. H. SMITH.

### IN EQUITY.   DECIDED MARCH 4, 1857.

#### *For an Injunction.*

Where the defendant has paid a large and valuable consideration, without any notice of the complainant's claim, has made his proofs, and has had the decision of the General Land Office in his favor, he has obtained an advantage of which a Court of Equity will not deprive him under the circumstances.

Messrs. LAWRENCE AND DAVIDGE for the Complainant.

Mr. JAS. M. CARLISLE for the Defendant.

This bill was brought to obtain an injunction to prevent the issuing of certain script to Jonathan B. H. Smith, the defendant, by the Land Office, and to have cancelled the assignment under which Smith had been adjudged by the officers of the government entitled to the script.

The counsel for the defendant, Smith, made the following points:

1st. The defendant's title is admitted by the bill *modo et forma*, it is set up in the answer: The execution of the instrument, the payment of a full and valuable consideration; the absence of notice in fact; the inquiry at the General Land Office; the apparent title of·Scott at that office, and the fact that the complainant's title-paper was in the private iron safe of Pruit, after the defendant's purchase, are proven by Webb, the complainant's witness.

2d. The complainant's assignment, prior in time, if admitted to be founded upon a sufficient consideration, and valid as between the parties to it must be postponed to that of the defendant, who is *portior in jure* by reason of his superior diligence, and because the complainant, by his laches, has enabled the common assignor to perpetrate a fraud upon the defendant, if the assignment to the latter be allowed to be defeated by the complainant's "pocket conveyance."

3d. The complainant's assignment is not proven; the power of attorney does not prove it as against the defendant. Neither time, place, nor consideration is specified in the recital; nor is there any proof *aliundi* upon either of these particulars. The complainant, therefore, has not made out such a case as to induce a Court of Equity to interfere as against a *bona fide* purchaser for full and valuable consideration without notice, actual or constructive.

4th. The bill itself shows that the defendant, by his superior diligence, is in a present capacity to receive the fruits of his assignment, and in substance, as a holder of a legal title in aid of his equity, since the authority charged with the execution of the law has determined that the defendant is "the present proprietor of the warrant, and entitled to receive the script, and shall receive it unless this Court interferes."

The principle that the subsequent in date of two otherwise equal equities, shall not be disturbed if it be aided by the legal title (or in other words if the holder of it will prevail if "let alone") applies to this case.

Corcoran and Judson, 17 How. 615, and the cases there cited and approved, and the same case in this Court,[1] so far

---

[1] Page 146 of this volume.

as not covered by the opinion of the Supreme Court are relied on in support of the law involved in the foregoing propositions.

The points made by Mr. Laurence, the counsel for the complainant, were as follows:

1st. The sale to complainant was prior in time to defendant.

It is proved by an instrument under seal, dated March 30, 1837, the due execution thereof by Wm. S. Scott, under whom both parties claim title, is admitted by the defendant in his answer and his counsel in argument.

This instrument, even if a mere recital of sale, as stated in defendant's answer, would still be sufficient evidence of complainant's title. It recites the absolute sale to complainant of the warrants mentioned, and declares its object to be to secure to him the unsatisfied ten per cent., and any equivalent which may be granted therefore. It further invests complainant with all the powers over the property possessed by Scott. There is no prescribed form for the assignment of these warrants; any paper showing on its face the intention of the grantor to transfer his title to the grantee is sufficient.

2d. As to the consideration of complainant's assignment.

1. If the legal title passed by the sale and the above instrument (and that it did is demonstrable) the question of consideration is immaterial, the legal title will be protected.

2. Even when an equitable title passes, if the intention to transfer be clear, and the transfer be complete, neither a Court of law nor equity will inquire into the consideration. McNulty *vs.* Cooper, 3 G. and J., 214, 219.

3. But if the consideration be inquired into that there was a valuable consideration is fully established by an instrument under seal, the execution thereof is admitted, and which recites a sale and the delivery in pursuance of such sale of the script which had issued.

Again the answer denies consideration on information, not even belief. A replication was filed, and no proof was offered by the defendant to sustain his allegation. Complainant's proof is that there was a valuable consideration. It

must be admitted that the *ex parte* affidavit of Scott, upon which alone the denial of the answer is based, (putting out of view his motive to conceal his fraud) is not evidence.     But even if it were, he is contradicted by the testimony of Webb, the agent who negotiated the sale claimed by defendant.

It may be remarked that defendant claims as heir at law and executor, and does not profess to have any personal knowledge of the facts before August 31, 1852.

3d.     As to the instrument under which the complainant claims.

This, it is said, is a mere letter of attorney, and not an assignment or evidence thereof.

To distinguish it as such is utterly to disregard its contents; but if it be a mere power it is coupled with an interest and is irrevocable.     Hunt *vs.* Rousmanier, 8 Wheat, 174; S. C. 1 Pet., 1, and being given for a valuable consideration, (the purchase of the warrant mentioned in it), it would operate as an equitable transfer.     Brownley *vs.* Holland, 7 Ves. 28; Bergen *vs.* Bennett, 1 Caine's Cases, 18; Raymond *vs.* Squires, 11 Johns, 47; The People *vs.* Tioga, 19 Wend, 73.

The paper however is manifestly evidence of absolute sale and assignment.

4th.     It is argued that although complainant be *prior in time-pose* the defendant is *potior in jure*.

The general rules is stated by the Supreme Court in Judson *vs.* Corcoran, 17 How., 615; to be "that the purchaser of a chose in action, or of an equitable title must abide by the case of the person from whom he buys."

The defendant seeks to bring himself within exceptions to this rule.     It is plain the burden of proof is upon him; if he fails to show his case to be an exceptional one, the general rule must prevail.

He relies upon two propositions.

1.     That complainants assignment had not been filed by him in the General Land Office, when defendant's father purchased Jan. 18, 1838.

2.     That there has been an adjudication, the effect of which was to invest defendant with the legal title, and that

consequently if the equities are equal, the legal title which defendant has drawn to his equity will prevail.

As to the first proposition:

It is not pretended that there existed any law, regulation or usage requiring the filing of complainant's assignment in the General Land Office. If requisite, it must be on some general principle of equity applicable to this case.

The whole equity set up by defendant, by virtue of which he claims to be within an exception to the general rule, is that in 1838; his ancestor before concluding his purchase, made inquiry at the General Land Office of a subordinate clerk, and was told by him that there was no prior assignment on file.

But in answer to this it is submitted that by the express terms of the Act of March 3, 1834, (4 Statute at Large, 770) the appropriation of land thereby made was "in full satisfaction" of all further claim against the Federal Government. The claim which remained after the surrender of the warrants was against the State of Virginia, and it cannot be doubted that as against her there was a claim (Cornegys *vs.* Vasse, 1; Peter 193 and especially 216.) Now it is not asserted that complainant's assignment was not filed at Richmond, the proper place, or that any examination was there made.

If, as is indubitably true, all claim was extinguished as against the Federal Government, upon the surrender of the warrants and receipt of the Receiver's tenths of the script, why file here the assignment to complete? especially why file it at the General Land Office—the only place where search is alleged to have been made? If it was conceived that Congress might possibly, in its liberality, make provision in a case where no claim, legal or moral or equitable existed, of what would that provision consist—land or money? and what department of the government would be charged to administer that provision?

To maintain complainant's proposition it must be shown that there was proper diligence on defendant's part and gross neglect on complainant's. The diligence alleged seems to have consisted in looking for the assignment, where no one could reasonably expect to find it, the gross neglect in not

filing it where no one could be reasonably expected to look for it.

It will be observed that notice was not necessary to perfect the assignment. 1 Story's Equity Jurisprudence, 421 c; 2 Lead. Cases in Equity, 238 &c; nor is there a case where a trustee, having paid to a subsequent assignee, without notice of the claim of a prior assignee, and in ignorance of it, seeks to be protected, and where different considerations might be applicable.

Again Equity requires notice only to the debtor or trustee holding a fund. (Judson *vs.* Corcoran, 17 How. 615.) It does not require notice to a party standing in no fiduciary relation to the assignor. Here the Government of the United States was not a debtor nor a trustee in any the largest sense; nor was there any fund or any right to call for a fund after the '' full satisfaction '' had been made.

Far different was Judson *vs.* Corcoran. There Judson took his assignment, of a mere equitable title, in January, 1845, and did not set it up until May, 1851, when Corcoran had been adjudged by the Board, the owner of the fund. The claim against Mexico had always been recognized by this Government, and was the subject of negotiations before 1839, when it was submitted to the mixed commission. With these negotiations, the State Department was exclusively charged, and it was the only channel through which redress could be obtained, and hence the propriety of filing in that Department. Judson failed to file until three years after the Treaty of Gaudalupe Hidalgo, and two years after the passage of the Act of Congress to carry out its provisions. There was from the origin of the claim, what was equivalent to a fund, and there was also the right to call for it. Until the Treaty the State Department was the exclusive representative or trustee of the claim, the claimant having no recourse against nor means of communicating with the Mexican Government, save through that Department. After the Treaty and Act of Congress there was an actual fund *in esse*.

There was then from the inception of the claim an ascertained legal depository with which to file, until the passage of the Act of Congress—the State Department—after-

ward the Board. There was also a valid, subsisting, unsatisfied claim throughout. There was no "full satisfaction" as here. As to the legal character of the claim in the case of Judson vs. Cocoran, see Comegys vs. Vasse, 1 Pet. 193, 216; see also De Bode vs. Regina, (in Dom. Proc.) 16, Law and Equity 14, in which, at p. 23, the Lord Chancellor (St. Leonards) uses the following language:

"It is admitted law, that if a subject of a country is spoliated by a foreign government, he is entitled to obtain redress from the foreign government, through the means of his own government. But if from weakness, timidity or any other cause on the part of his own government, no redress is obtained from the foreigner, when he has a claim against his own country."

In the present case there was a settlement under the Act of 1835, if there can be one full satisfaction.

But complainant's assignment was filed in the General Land Office in June or July, 1838, certainly in the Autumn of that year when Webb saw it. The Act, making provision for the unsatisfied ten per cent. was passed August 31, 1852. (10 Statute at Large, 148) fourteen years then before the Federal Government was in any sense debtor or trustee; and before any fund existed in its hands, or there was any shadow of right to call for a fund, the assignment was filed.

To deprive complainant of his superior title, in consequence of his prior purchase, there must be gross and unwarrantable neglect.

The time of giving notice depends upon the special circumstances of each case. There is no fixed rule, but undoubtedly if the thing to be transferred be a mere possibility or expectancy, a larger time will be allowed. Even in the case of the transfer of real estate, the Acts of Maryland have allowed six months for recording the deed and protecting the purchaser (within that time) against any subsequent purchaser, though *bona fide* and without notice. The true question is not whether the defendant may sustain damage in consequence of complainants not filing in the General Land Office, (for that may manifestly occur where there would be no exception to the general rule) but whether under

all the circumstances—there having been full settlement and satisfaction with the Federal Government, there being no fund nor right to call for or even to expect one, &c., &c., gross and unwarrantable laches can be imputed to complainant.

As to the second proposition: that defendant has drawn to his equity the legal title.

Here, too, it is incumbent on him to bring himself within an exception to the general rule.

To do this he must show:

1st. That he has an equal equity.

2nd. That he has the legal title.

The first of these propositions has already been sustained.

As to the second, has defendant the legal title, and when and how did he obtain it?

The only legal title he depends upon is under the letter of the Commissioner, dated August 3, 1854. If complainant has the legal title before that time, or if defendant did not obtain it by virtue of the letter, the case is not brought within the exception.

On behalf of the complainant it is submitted:

1st. That Virginia Military Land Warrants are the subject of ownership at law, the title to them is as much a legal title as that of the proprietor of State stock, negotiable paper, &c., or of a bond in which he is the obligee.

2d. That they are assignable, the legal and not the mere equitable title passing to the assignee. 2 Revised Code of 1819. pp. 371, 372, &c., &c. Revised Code of 1849.

The whole legislation of Congress recognizes the quality of assignability, and shows that Congress has never designed to interfere with the legal character of these warrants so established by Virginia, but merely to provide the means to satisfy them.

The cases of such recognition might readily be enumerated.

It will be observed that by the 4th section of the Act of May 30, 1830, ch. 215 (4 Statute at Large 422), it is provided that the script to be issued under it should be receivable in payment of lands offered at public sale and remaining unsold at

any of the land offices in Ohio, Indiana and Illinois. And afterwards by the Act of Congress of March 2, 1833, ch. 94, (4 Statute at Large 665), such script was made receivable in payment for any of the public lands liable to sale.

The 2d section of the Act of 1830 provided that the script to be issued upon warrants granted after its passage should be issued to the party originally entitled. But these provisions did not alter the assignable quality of the warrants. (See Act of July 7, 1838, ch. 166; 5 Statute at Large 262.) They merely extended the area out of which the warrants were to be satisfied, and imposed in certain cases a restriction as to the mode of using the script. Warrants still continued assignable. An assignee could still, when he held warrants, *though* issued after the passage of the Act of 1830, vacate them and obtain patents.

Even the restriction as to the mode of issuing the script was afterwards repealed.

The Act in question, August 31, 1832, required the script to be issued to the "present proprietors." It also, like the many preceding acts, recognized the assignability of warrants, and it further recognized it for all purposes whatsoever. All restrictions as to the script, and directing it to be issued to the present proprietors of the warrants. The simple question involved is: who at its passage was the proprietor of the warrants connected with this controversy? The heirs of Lee held a legal title, not an equitable one, which passed by the sale made by Scott to the complainant. No law regulation or usage required the filing of the assignment to complete the transfer. That has not been contended. Congress could, in 1852, make its grant to whom it thought fit. It chose to make it to the proprietors at that time of the warrants.

It is urged, however, that the legal title was surrendered when the warrants were filed at the General Land Office under the Act of 1835. But: 1st the surrender was the "full satisfaction" only as to the United States. The warrants still had valuability as regarded Virginia.

2d. The Act of 1852 expressly recognized ownership after the surrender. Its terms are "present proprietors of any warrants thus surrendered."

3d.   If the legal title was surrendered by the election to take under the Act of 1835, so would have been an equitable title.   But this defendant does not contend for, and wisely, as he would thereby defeat his so-called equity.   The result of the argument is, and would clearly be, that the provision of Congress in 1852 would find the first assignment the complainant's.

That even if the warrants were not legally assignable, even if complainant never held any legal title (if that can be supposed,) the defendant never obtained that legal title under the Commissioner's letter as he maintains he did.

1st.   Because even the Secretary of the Interior, much less a subordinate, the Commissioner, an officer unknown to the law, had no jurisdiction *inter partis*, and could not in any manner effect their rights.   Comegys *vs.* Vasse.

2d.   If jurisdiction existed, the Secretary, the only officer known to the law, has not acted under the Act of 1852; the Secretary of the Interior is to issue script.   The action of the Commissioner, until submitted to the Secretary, and approved by him, is no more than the action of any other subordinate.   All the script has to be signed by him, the Secretary.

3d.   The letter of the Commissioner clearly shows he did not intend to effect the rights of either party, and that his action was not final.

The language of the letter is that a reasonable time will be given to test the matter before Court, "before further action will be taken."

Even his action was inchoate and incomplete   No order was given to prepare the script.   It is not sufficient that the possession of the legal title by the defendant, upon which Corcoran & Judson turned in the Supreme Court, can be seriously maintained.

In reply to the complainant's points the following propositions are relied on:

1st.   The argument as to "legal title" in the complainant can only apply to the warrant.   The warrant is only an authority to locate and survey.   The "legal title" to this warrant never was in any person but the heirs of Lee, unless

the recent decision of the Commissioner, that Smith (the defendant) is the "present proprietor" put it in him. Whatever title any other person could have had in it, was necessarily an equitable title merely.

2d. The so-called legal title, which existed in 1837–8, was surrendered with the warrant to the United States, by the election, to take under the Act of 1852.

3d. The statutes cited by Mr. Lawrence, if they show that the assignee could not be recognized at the Land Office, (because the script could only issue to the warrantee, his heir or devise) by the same showing, demonstrate that the claim of an assignee was purely equitable. Congress could not deprive that property of the incident of being alienable. The policy of this and other laws in *pare materia* was to protect the warrantee, and to make every assignment depend upon its equity; not to prevent equitable assignments, which would have been inconsistent with the enjoyment of the property. Therefore equitable assignees were referred to the Land Office, when the warrants were deposited, and from which all benefit of ownership must issue. And so the complainant himself understood, but he delayed to give notice there until after the defendant, by his laches, had been rendered to purchase on the faith of Scott's apparent right to dispose of the subject matter in the name of Lee's heirs.

This cause coming on to be heard on the bill, exhibits answer, general replications and depositions; and the same being seen and read by the Court. And the parties by their solicitors being heard, and the matter being fully understood, it was ordered by the Court, on mature deliberation, that the complainant's bill be dismissed with costs, &c.

On appeal to the Supreme Court of the United States the decree was affirmed. See 21 Howard, 579.